## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHELLE DIXON AND CHARLES POWELL, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>TARGET CORP.,<br><br>            Defendant. | Court File No.: _____<br><br><br>CLASS ACTION COMPLAINT<br>AND<br>JURY DEMAND<br><br>(Equitable Relief Sought) |

## <u>NATURE OF THE ACTION</u>

1.     This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant Target Corporation ("Defendant" or "Target"), arising from its deceptive naming and marketing of its so-called "Target Debit Card"—which is actually not a debit card at all, functions nothing like virtually every other debit card on the market, and exposes consumers to double, triple, or quadruple-fee penalties for small insufficient funds transactions that are more severe than other payment methods.

2.     Target misrepresents the nature of the Target Debit Card by the product's very name, by issuing marketing materials and card agreements that fail to correct

1

reasonable understandings of the name, and that on their own misrepresent the actual functioning of the card.  Specifically, Target omits and conceals material facts about the Target Debit Card, never once informing consumers in any disclosure, at any time, that: (a) use of the card can commonly result in two, three, or four fees in the event of an insufficient funds transaction, or approximately *$150 in fees*; and (b) the card operates on the Automated Clearinghouse Network ("ACH Network"), not the debit card networks used by virtually every other debit card.

3.      In 2012, the Target Debit Card was responsible for $4.2 billion (or 5.7%) of Target's retail sales. But because the deceptively named "Target Debit Card" processes transactions unlike virtually every other debit card in the country, and because Target never warns consumers of the significant fees consumers risk incurring by using the card, Plaintiffs and reasonable consumers are surprised to discover that use of the Target Debit Card can cause huge fee penalties from both Target and their banking institutions when the checking account to which the Target Debit Card is linked has insufficient funds for purchases.

4.      Plaintiffs and reasonable consumers understand a typical "debit card" transaction to result in the immediate approval or denial of purchases based on available account balance, and to feature immediate withdrawal or hold of funds for approved

2

purchases.  The Target Debit Card does not do either, and, in fact, does not even attempt to deduct funds from the consumer's account or or notify the consumers' banks of the transaction for two to seven days after the purchase is made.  The practical impact of the delay is that consumers expecting the Target Debit Card to function like the other debit cards in their wallet, declining or authorizing transactions immediately, are instead pummeled with fees—including two, three or even four separate fees on the same transaction—that are literally impossible to incur with a true debit card.

5.     Target customers nationwide have been assessed tens of millions of dollars in so-called Returned Payment Fees ("RPFs") by Target on purchases they made with the Target Debit Card that they believed would have either been deducted immediately or rejected immediately, as well as an additional tens of millions of dollars in insufficient funds fees ("NSF Fees") from their own banking institutions on the same transactions.

6.     Hundreds of thousands of those consumers have been assessed three fees (one from Target and two from their own bank), for a total of over $100 on a single Target Debit Card transaction, which occurs after Target re-submits a transaction for payment.  In addition, hundreds of thousands of Target Debit Card transactions were submitted and rejected for payment three times, which means they were assessed four fees (one from Target and three from their bank), for a total of approximately $150 in fees on a single

3

Target Debit Card transaction.

7.     These unconscionable fee penalties—which often dwarf the amounts of the underlying purchase transactions—were never disclosed by Target and would not have been assessed had the Target Debit Card functioned like bank-issued debit cards. Reasonable consumers would not knowingly assume these massive fee risks by signing up for and using the Target Debit Card, had these risks been fairly disclosed.

8.     Unlike virtually every other debit card, and contrary to reasonable consumer perception, the Target Debit Card does not cross reference account balances to determine whether sufficient available funds exist for the purchase prior to approving it. Consumers expecting purchases to be rejected for insufficient funds are surprised they were allowed to make overdraft purchases, and consumers who make purchases at a time when their accounts have sufficient funds are surprised to have those same transactions later returned by their banks for insufficient funds.

9.     All this occurs because the Target Debit Card is fundamentally different from virtually all other debit cards.  The Target Debit Card does not use the same processing networks as other debit cards, the latter of which allow for instantaneous processing. Instead, Target uses a slower processing network—a crucial fact it never once discloses to consumers.

4

10.    Instead, the Target Debit Card has been marketed consistently and aggressively for nearly a decade as a debit card.  Target was well aware that consumers reasonably understood that Target's "debit card" would work like the other "debit cards" in the marketplace. Target knew its "debit card" was widely misunderstood, and indeed actively worked to foster the known misperception.

11.    Target entices consumers to sign up for and use the Target Debit Card by offering a 5% savings on all Target purchases. By incentivizing consumers to use a Target Debit Card over other electronic payment forms, Target saves on transaction costs associated with processing credit card or bank-issued debit card transactions.

12.    Not only does Target save money when consumers use the Target Debit Card, but it gains a rich source of additional revenue in the form of RPFs assessed directly to consumers who use the card—revenue it increases by means of deceptive practices.

13.    Consumers increasingly prefer to use debit cards for everyday purchases, as debit cards allow purchases to be drawn directly and immediately from checking accounts—something which provides purchasing control, budgeting help, and the peace of mind of making purchases without going into debt.

14.    Consumers like Plaintiffs expect debit cards to result in an immediate debit from their checking accounts if sufficient funds are available, or to result in a purchase

5

declination at the point of sale if there are insufficient funds to cover the purchase—indeed, these are inherent aspects of debit cards.

15. If the Target Debit Card were a true debit card, the consumers would incur *zero fees* when an attempted transaction is rejected for insufficient funds and would only incur a *single* overdraft fee when they affirmatively request the authorization of overdraft purchases.

16. True debit cards, unlike the Target Debit Card, come with significant consumer protections with respect to overdraft fees.  For true debit cards, banks cannot assess overdraft fees on debit card transactions unless consumers affirmatively request such overdraft "protection."  Target Debit Cards have no such protections.

17. In account documents, employee interactions, public statements and marketing materials, Target bolsters and exploits these consumer perceptions regarding the performance of debit cards by misrepresenting the true nature of the Target Debit Card and omitting and concealing material facts about it.

18. Plaintiffs seek, among other remedies, injunctive relief that fairly allows consumers to decide whether they will run the extreme risk of using the Target Debit Card.

6

## PARTIES

19.    Plaintiff, Michelle Dixon, is a citizen of the State of Florida who resides in Spring Hill, Florida.

20.    Plaintiff, Charles Powell, is a citizen of the State of North Carolina who resides in Durham, North Carolina.

21.    Defendant, Target Corp., was incorporated in Minnesota and maintains  its principal business offices in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

22.    This Court has original subject matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiffs are citizens of Florida and North Carolina, respectively, and Defendant is a citizen the State of Minnesota, at least one member of the class is a citizen of a state different from Defendant. Further, Plaintiffs allege the matter in

controversy is well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, Plaintiffs allege "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

23.    This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Target's headquarters are located in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Debit Cards Increase in Popularity in the 2000s

24.    Checking accounts are the product most consumers use to receive and deposit funds, withdraw cash, and make payments for everyday expenses and loan payments. Consumer Fin. Prot. Bureau, Study of Overdraft Programs: A White Paper of Initial Data Findings 47 (June 2013) (CFPB Study), http://bit.ly/1NvT3Nv.  Over the last several decades, the mechanisms available to consumers to withdraw funds or make payments from checking accounts have expanded and grown more complex.  *Id*. Beginning in the mid-1970s, the advent of ATMs made it possible for consumers to withdraw cash from their accounts without visiting a branch teller line and to do so 24/7. *Id*.  Then debit cards exploded in popularity:

> Many institutions subsequently expanded transactional capabilities by replacing ATM-only cards with debit cards that could also be used to make electronic payments to merchants and service providers from checking accounts.  Debit card

transaction volumes have grown quickly as the networks that enable these transactions have broadened. Acceptance by grocery stores, gas stations, and other retailers helped to drive the popularity of "online" or "PIN debit" payments across regional and global ATM networks…In 2006, debit card payment transaction volumes in the U.S. exceeded both check and credit card payments, and from 2006 to 2011, the total volume of U.S. consumer debit card transactions nearly doubled.

*Id*. at 11-12.

25.     Debit card transactions tend to be smaller than checks and ACH payments and the average industry-wide debit card transaction in 2010 was $37, while checks averaged $85 and ACH $113. *Id*. at 46.

26.     Consumers have turned to debit cards for every day, small purchases for several reasons.

27.     Debit cards, as Investopedia.com explains, "deduct money directly from a consumer's checking account" and "*do not allow [consumers] to go into debt*" since the money is deducted from a consumer's account immediately.[1]

28.     This is the widespread, common consumer understanding, including Plaintiffs' understanding, of debit cards—since it is how virtually every debit card in the United States works—except, that is, for the Target Debit Card.

---

[1] *See* http://www.investopedia.com/terms/d/debitcard.asp; *see also* https://www.consumer.gov/articles/1004-using-debit-cards.

29.     Consumer research indicates that consumers prefer debit cards as a budgeting device, because they don't allow debt like credit cards do, and because the money instantly comes directly out of a checking account.

30.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; **the money is immediately deducted from your checking account**. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear."[2]

31.     In other words, the key benefit of a debit card is that it allows consumers to control spending and to rest assured that funds are deducted immediately as they are spent.

32.     Unsurprisingly, due to these consumer-friendly benefits, in 2015, consumers in the United States used their debit cards on average 21 times per month, which is a 32% rise in usage over the past ten years. The amount consumers spend with their debit cards is also on the rise. In 2015, Americans spent, on average, $9,291 annually with their debit card, up from $7,807 ten years ago.

---

[2] *See* http://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (emphasis added).

33.     According to a 2015 study conducted by Pulse, one of the nation's leading debit/ATM networks, "Consumer use of debit has been nothing short of remarkable. . .Debit has steadily gained wallet share as consumers shift their spending to this payment type. The use of debit for small-ticket purchases is particularly noteworthy, where one-third of all debit transaction are for less than $10 – purchases that historically would have been made with cash or not at all." (internal citations omitted).

34.     Consumer Action, a national nonprofit consumer education and advocacy organization, helps explain why: "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."[3]   This is a large part of the reason that debit cards have risen in popularity.

**B. True Debit Card Processing**

35.     True debit card processing involves several distinct steps. As relevant here, there are two key steps: authorization and payment:

**Authorization.** When an account holder makes an ATM withdrawal or debit card purchase (also known as "point of sale" purchase), her bank "receives an

---

[3] *See* https://www.consumer-action.org/english/articles/understanding_debit_cards.

instantaneous request to authorize the transaction" from the merchant. Consumer Fin. Prot. Bureau, Study of Overdraft Programs: A White Paper of Initial Data Findings 47 (June 2013) (CFPB Study), http://bit.ly/1NvT3Nv. CFPB Study at 42. If the charge does not exceed the account holder's available balance the bank immediately accepts the merchant's request, authorizes the transaction, and places a "hold" on the necessary funds. From that point forward, the bank is required to pay the merchant the promised funds, even if that payment does not occur immediately. If the bank approves the authorization request, the bank immediately makes a "hold" or "memo posting" that "reduces the funds deemed to be available to the consumer" in her checking account by "the amount of the authorized transaction." *Id.* Doing this ensures that the consumer has "sufficient funds in the account when the transaction is presented for settlement." Unfair or Deceptive Acts or Practices, 74 Fed. Reg. 5498-01, 5546 (Jan. 29, 2009). In other words, the whole purpose of an "immediate" hold is to ensure funds exist to pay the held transaction when it settles.

If, on the other hand, the charge exceeds the account's balance at the time the authorization request comes in, the bank has a choice: It may either accept or reject

the merchant's request for authorization. *Id.* If it accepts the charge, the bank follows the same procedure as it did for a transaction authorized on positive funds. If it rejects the charge, the transaction is declined and the account balance is not decremented.  (As discussed further below, institutions typically decline ATM and debit card transactions on accounts not "opted in" to overdraft coverage that would otherwise result in an overdraft or increase the outstanding negative balance of an account.  CFPB Study, 12).[4]

**Settlement.** For debit card transactions, a consumer's swipe at the register does not always result in immediate payment by the bank. *Id*., 42. After authorization, a merchant must still send a separate demand for payment. That demand typically occurs "on the same business day [the transaction is] authorized," but it can also come "a day or two after authorization*."* CFPB Study at 42. It is on that day that the merchant receives funds from the bank.

36.     Across the banking industry, overdraft services—which have been around

---

[4] This process works differently for debit cards than it does for other transactions like checks and automated clearinghouse transactions (ACH). For these financial instruments, a bank can "decide whether to pay or return" overdrawn checks at the time they are presented for payment because, in effect, authorization and payment occur simultaneously. *See* CFPB Study at 48.

for decades—share several common characteristics. For example, a bank that offers an overdraft program must "disclose to consumers that the payment of overdrafts is discretionary, and that the institution has no legal obligation to pay any overdraft." Truth in Savings, Final Rule, 74 Fed. Reg. 5584, 5585 (Jan. 29, 2009). If a bank does pay, however, the fee charged for an overdraft remains fixed—it will not vary based on "the amount of the overdraft." *Id.* And, although banks historically offered overdraft coverage only for check transactions, recent years have seen most institutions extend their coverage of overdrafts to non-check transactions, including ATM withdrawals and debit card purchases. *Id.* The increase in overdraft coverage for debit card transactions led the Federal Reserve, in 2009, to require financial institutions to secure a customer's "affirmative consent"—in essence an opt-in requirement—before charging overdraft fees on debit card transactions. Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59036 (Nov. 17, 2009). A key aspect of debit cards is that there are no fees when transactions are rejected (which occurs when consumers do not opt in). Transactions that an institution decides to pay into overdraft may then incur an overdraft fee. Transactions initiated by check or ACH that the institution rejects usually generate a non-sufficient funds (NSF) fee; in contrast, institutions do <u>not</u> charge an NSF fee when declining a debit card authorization inquiry at a merchant. *Id.*

14

37.     In sum, debit card transactions with insufficient funds are liable for one overdraft fee at most, and even then, only when the consumer expressly asks for overdrafts to be paid.  True debit card transactions can never cause a consumer to incur an NSF Fee.

## C. The Target Debit Card is Not Like Other Debit Cards

38.     The Target Debit Card bears none of the indicia of a true debit card.  There is no immediate authorization or rejection based on an account's available balance, nor—in the case of authorized transactions—a hold on funds needed to pay the transactions when they settle.

39.     Unlike true debit card transactions, a Target Debit Card transaction is not limited to a single overdraft fee; Target Debit Card transactions can incur up to <u>four distinct fees</u>.

40.     Nor are overdraft transactions approved only if expressly requested by the consumer; Target itself makes that choice in its discretion.

41.     When a true debit card transaction is declined for insufficient funds, there is no fee assessed to the consumer; when a Target Debit Card transaction is declined, there are up to four.

42.     In short, the Target Debit Card does not have the immediacy of a true debit

15

card.

43.     These differences exist because the Target Debit Card uses an entirely different processing network from other debit cards, the ACH network.

44.     This processing choice has major, real world fee effects on consumers—effects which are misrepresented to, and concealed from, consumers.

45.     Here's how the Target Debit Card actually works.  When a consumer attempts to use a Target Debit Card to make a purchase online or in a Target store, Target decides whether to approve or reject the transaction.  If a transaction occurs and is approved, no funds have been moved from the consumer's checking account, the consumer's bank has not been notified the transaction exists. No transaction processing outside of Target has even begun.

46.     At some later time, Target or its agents submit the transaction into the ACH system for processing—the same system used by many retailers for paper check processing.  Once Target or its agent enters the ACH transaction into the system, generally funds will be deducted from consumers' checking accounts within a couple days.

47.     This means no consumer bank can be notified of a Target Debit Card transaction, and no Target Debit Card transaction can be deducted from a consumer's checking account, immediately or even on the same day it takes place.

16

**D. If a Target Debit Card Transaction is Returned for Insufficient Funds, Target Assesses a Returned Payment Fee, then Repeatedly Resubmits the Transaction for Payment Without Notifying Consumers—Causing More NSF Fees**

48.     If a Target Debit Card transaction is returned for insufficient funds by the consumer's bank, Target immediately assesses a Returned Payment Fee ("RPF") of between $20-$40, depending on the state in which the transaction was made.

49.     These varying RFP amounts are actually set by state law for bounced paper checks—as clear an indication that a Target Debit Card transaction is more like a paper check than any other form of payment.

50.     But in the context of electronic transactions, the RPFs charged by Target are exorbitant and excessive, since the fee far exceeds Target's cost in electronically re-submitting and recovering the amount of the insufficient funds transaction.

51.     The paper check-based RPFs bear no relationship to Target's actual cost of collections, or its risk in authorization such transactions. Indeed, because the vast majority of initially declined Target Debit Card transactions are paid to Target after it repeated resubmissions, Target bears little risk and little cost.

52.     The RPF is, in other words, virtually pure profit for Target.

53.     After an initial return for insufficient funds, Target has a strategy to repeatedly re-submit Target Debit Card transactions into the ACH system for payment.

17

After first assessing an RPF on each returned transaction, Target then repeatedly re-submits the transactions up to two more times. It does so without checking consumer account balances, and without even notifying consumers that it will do so.

54.    In sum, after a Target Debit Card transaction is initially rejected for insufficient funds, Target re-submits the transaction. If it is still unpaid, it submits the same transaction for the *third* time. There is no possible way any for this "representment" to take place with a true debit card. Rather, there is a single pay or reject decision, period. Worse, Target has designed a process that fails to alert consumers there is a problem with their Target Debit Card payment—a lack of notice that is especially devastating because consumers like Plaintiffs understand the Target Debit Card will function like a true debit card.

### E.  Target Omits and Conceals Material Facts About the Target Debit Card

55.    Target concealed from users (a) the punishing risk of double, triple or quadruple insufficient funds fees on Target Debit Card purchases; and (b) that its card was unlike virtually every other debit card on the market in material aspects, including that it used an entirely different processing network and pattern. Target's decision to conceal these material facts is unsurprising, since reasonable consumers would not run the risk of using the Target Debit Card if adequately informed of the absurd and exploitative

18

penalties for doing so.

56.     Target's marketing materials—including in-store pamphlets and posters—never disclosed these risks and material facts, instead luring consumers to sign up for and use the so-called "debit card" with a promise of "5% off."

57.     The agreement purportedly governing the Target Debit Card never disclosed these risks and essential facts, and—as discussed below.

58.     Target refers to the card as the Target Debit Card, on the card itself, in marketing materials, and in consumer interactions with store employees.

59.     But it never explained in its marketing that the Target Debit Card was vastly different from bank-issued debit cards.  In marketing the Target Debit Card in-store and elsewhere, Target focused on the product's primary benefit:  5% off purchases.

60.     Target aggressively promoted the product during checkout. Target cashiers had incentives to sign up us many Target Debit Card accounts as they could while focusing on the product benefits.

61.     Target also prominently features in-store signage touting the Target Debit Card.  As with the cashier interactions, the focus is always on Target Debit Card benefits (5% off) and never about the true nature or risks of the card.

62.     But the omissions do not stop there. When a Target Debit Card transaction is

returned to Target for insufficient funds, Target does not inform the cardholder of the return. Doing so, of course, would allow the cardholder to pay the transaction, either by paying Target directly or attempting to add funds to the checking account.

63.    Instead, bizarrely, Target does not inform the consumer of the payment return until after it has attempted to debit the account several more times.

64.    Target conceals, in other words, the very fact that gives rise to the triple- and quadruple fee penalties discussed herein:  the initial rejection of a Target Debit Card transaction for insufficient funds.

**F.  The Target Debit Card Agreement Misrepresents the True Nature of the Card and Omits and Conceals Material Facts About It**

65.    Far from disclosing the true operation of the mis-named Target Debit Card in fine print, Target issued fine print that doubled down on its intent to ensure consumers could not learn the truth about the Target Debit Card.

66.    Not even in the fine-print agreement governing the Target Debit Card did Target plainly and clearly say what it so obviously true:  use of the card can result in overdraft fees and *up to three NSF Fees* from a bank on a single transaction; the card operates on the ACH network used by consumers for insurance and utility payments, not the networks that true debit cards use; the card functions unlike all other debit cards; the

card does not authorize or reject transactions based on account balances; and that even a small insufficient funds Target Debit Card transaction would result in at least in $70 in fees and t worse could result in $150 in fees.  It told consumers none of this.

67.    The agreement governing the Target Debit Card (the "Target Debit Card Agreement") is dense. Even if a reasonably diligent consumer could locate the relevant terms, and despite a promise that "This agreement explains how your Target Debit Card ("Card") will work," the Target Debit Card Agreement still wholly fails to explain the operation of the Target Debit Card—or even the processing network it operates on. Attached as Exhibit A is a copy of the current Target Debit Card Agreement.

68.    Indeed, the Target Debit Card Agreement omits and conceals important facts about the Target Debit Card—most prominently, Target never discloses that the Target Debit Card operates on an entirely different network (the ACH Network) than true debit cards, which operate on the Visa or Mastercard networks. To the contrary, Target made affirmative representations that indicate to reasonable consumers the Target Debit Card would be processed on the same network and in the same manner as a normal debit card— including immediate authorization or rejection based on available funds in a linked checking account.

69.    This failure to inform consumers that the supposed "debit card" used a

different network is crucial:  on the networks used by true debit cards, an instant rejection or approval determination is made, and a rejection is totally fee-free.  Moreover, Target's repeated resubmission of declined transactions (and the 1-3 NSF Fees that result) *would have been impossible*.

70.     The total failure to specify that processing Target Debit Card transactions occurs on the ACH network (where authorization and settlement are essentially simultaneous, even if delayed) rather than the debit card network, means it was reasonable for consumers to understand that the terms of the Card Agreement were describing a true debit card, not a "card" that operated wholly unlike a debit card.

71.     Moreover, the Card Agreement states that "if you use this Card to make a purchase that exceeds the balance in the deposit account that you linked to this Card, that account may become overdrawn even if you chose not to allow overdrafts with respect to a debit card issued by your Depository Bank, and you may incur associated overdraft fees." But while the contract states that consumers may be charged "overdraft fees" by their bank if they overdraw their consumer checking account, *it never discloses that consumers will receive NSF fees from their bank for declined purchases*.

72.     As Target knows and reasonable consumers understand, "overdraft fees" are fees charged when a bank pays a transaction into an insufficient balance, while "NSF" or

"insufficient funds fees" are charged when a transaction is <u>rejected</u>.  As the CFPB Study points out, true debit cards only incur overdraft fees (and even then, only when a consumer specifically authorizes them); they do not get NSF Fees.  The Target Debit Card was different:  it could <u>also</u> incur NSF Fees—something literally impossible with true debit cards—but the Agreement never once discloses that possibility.

73.     By disclosing only the possibility of "overdraft fees," the Target Debit Card Agreement furthers the reasonable impression that the Target Debit Card is like true debit cards, for which only overdraft fees (and not NSF Fees) are possible.

74.     The Target Debit Card Agreement includes other express promises that indicate the Target Debit Card is a true debit card to reasonable consumers.  For example, the Agreement states: "When you use your Card, **you will be limited by the amount of funds in your Deposit Account…**as of the date the Depository Bank receives and processes an EFT."  Limitation "by the amount of funds in your Deposit Account" is only possible on the normal debit card network, not on the ACH network.  This must be understood to be a promise to use the normal processing network and decline transactions that are overdraft transactions.  Instead, Target actually does no such thing—indeed, it does not even check to see if there are sufficient funds in the account, as described above.

75.     Moreover, the Target Debit Card Agreement repeatedly obfuscates the true

processing decisions Target had already made.  For example, the Agreement states, "We *may* resubmit an EFT one or more times if the Depository Bank has not sent funds equal to the total previously requested EFT amount."  In fact, it was Target's systematic practice to always resubmit a transaction <u>twice</u> after an initial rejection for insufficient funds, until paid.

76.     Moreover, Target nowhere discloses that consumers are subject to a double, triple or quadruple penalty for what it deems to be an insufficient funds event—a double penalty that can be $100 or more, as occurred with Plaintiffs.  Target never states that a consumer will be charged both an RPF and an NSF fees by his or his bank during such an event—or, indeed, that a consumer can be liable for repeated NSF fees each time Target attempts unsuccessfully to debit an account.

77.     Target also promises that the Target Debit Card will be *even more strict than a normal debit card* in terms of rejecting transactions for which there are insufficient funds at the time of purchase: "You agree that the dollar amount limitation on your Card may be less than the dollar amount of available funds in your Deposit Account and that such dollar amount and transaction limitations may change from time to time without any notice to you."  But again, Target does nothing to ensure that insufficient funds

transactions are rejected—thus luring consumers into the double jeopardy, one-two punch of RPF and multiple NSF fees.

78.    The following provision is yet another promise to reject insufficient funds transactions at the point of sale:  "The Depository Bank may return as unpaid an EFT if, for example, your Deposit Account does not have sufficient available funds in it to cover the full amount of the EFT, or your Deposit Account is closed, or for other reasons." This is yet another attempt by Target to lure consumers into believing its debit card functions like a normal one.

79.    The Agreement shrouds the differences between the Target Debit Card and bank-issued debit cards. The Agreement misdescribes the true nature of the Target Debit Card, in order to falsely promise the benefits of a normal debit card without adequately disclosing the uniquely harmful and risky aspects of the Target Debit Card.

80.    For example, the Agreement states that "[y]ou agree that any EFT may occur several business days after your transaction(s) have occurred and after the date shown on your transaction receipt(s)." Of course, *that is also the case for true debit cards as* well, as described above.  But unlike with all other debit cards, Target neither immediately debits nor rejects Target Debit Card transactions—and it never informs consumers of that key difference.

25

**G. Consumers Believe the Target Debit Card Will Function Like a Normal Debit Card and Target Never Disclosed the Card's Extreme Risk to Consumers**

81.     Speed and immediacy are essential parts of a true debit card, and reasonable consumers understood the product named "Target Debit Card" would share those characteristics.

82.     Target never attempted to cure those misunderstandings in any marketing materials or in the product name itself.

83.     Most consumers, like Plaintiffs, sign up for the debit card when asked to do so by a cashier at a Target store, and are enticed with a 5% discount.

84.     Target furthers the consumer perception that the Target Debit Card works like a true debit card by requiring consumers to pick a unique PIN for use with the Red Card, and requires use of that PIN for purchases.  It states in the Target Debit Card Agreement (the "Agreement"):  "You must present your Card and enter your PIN if you wish to use your Card to pay for goods or services at Target retail stores."

**H. Myriad Consumer Complaints Indicate that Consumers Do Not Understand the Target Debit Card is Not a True Debit Card**

85.    Plaintiffs weren't the only reasonable consumer deceived by Target's deceptive, unfair and unconscionable practice of charging RFPs in connection with the Target Debit Card.

86.    Another consumer complains that she "was under the impression that the debit card worked like a debit card because it says it's a DEBIT card." She also understood that his Target Debit Card would function like all of her other debit cards and deduct funds immediately and deny transactions if there were insufficient funds in the linked bank account. However, much to her surprise, the transaction was processed a number of days later at a time when his linked bank account no longer had sufficient funds. The result was a $30 RPF charge from Target. *See* http://blog.credit.com/2012/08/what-you-should-know-about-store-brand-debit-cards-61250/ (last visited September 12, 2018).

87.    Reasonable consumers like Plaintiff are routinely deceived by Target's deceptive, unfair and unconscionable practice of charging RFP's in connection with the Target Debit Card.

**I.   Plaintiffs' Experiences**

88.    Plaintiff Dixon used her Target Debit Card to make a purchase at a Target on or around June 6, 2015, in the amount of $43.18.

89.    Target did not attempt to debit the transaction amount until June 8, 2015.

90.    Because Plaintiff Dixon had insufficient funds in her account at the time Target finally attempted to debit $43.18 for her June 6, 2015 purchase, Plaintiff's bank charged her a $35.00 NSF fee on June 9, 2015.  Target also assessed an RPF at that time.

91.    Accordingly, Plaintiff Dixon incurred two fees for one purported insufficient funds event.

92.    Plaintiff Dixon would not have made the transaction using her Target Debit Card if she had known the Target Debit Card did not function like a normal debit card, and if she had known that using the Target Debit Card would place her in jeopardy of several distinct fees.  If she had known either of these things, she would have chosen another payment method for her transaction.

93.    Plaintiff Powell used his Target Debit Card to make a purchase at a Target, in April, 2016, in the amount of $15.97.

94.    Because Plaintiff Powell had insufficient funds in his account at the time

Target finally attempted to debit $15.49 for his purchase, Plaintiff's bank charged him a $25.00 NSF fee on April 25, 2016.  Target also assessed an RPF at that time.

94. 95.   Target then attempted to re-debit the account on May 2, 2016, and the transaction again was returned for insufficient funds, and Plaintiff's bank again assessed an $25.00 NSF Fee on the transaction.

96.   Target then attempted to re-debit the account on May 9, 2016, and the transaction again was returned for insufficient funds, and Plaintiff's bank again assessed an $25.00 NSF Fee on the transaction.

97.   Accordingly, Plaintiff Powell incurred four fees for one purported insufficient funds event.

98.   Plaintiff Powell would not have made the transaction using his Target Debit Card if he had known the Target Debit Card did not function like a normal debit card, and if she had known that using the Target Debit Card would place him in jeopardy of several distinct fees.  If he had known either of these things, he would have chosen another payment method for his transaction.

## CLASS ALLEGATIONS

99.   Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and a Class of similarly situated persons defined as follows:

All consumers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred Returned Payment Fees in connection with their Target Debit Cards (the "National Class").

All consumers in state of Florida who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred Returned Payment Fees in connection with their Target Debit Cards (the "Florida Subclass")

All consumers in state of North Carolina who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred Returned Payment Fees in connection with their Target Debit Cards (the "North Carolina Subclass").

100.   Excluded from the Class are Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such person's immediate families, and the presiding judge(s) in this case, their staff,

101.   **Numerosity**:  At this time, Plaintiffs do not know the exact size of the Classes; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are well into the thousands, and thus are so numerous that joinder of all members is impractical.   The number and identities of Class members is

administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

102. **Commonality**:  There are questions of law or fact common to the Class, which include but are not limited to the following:

    a.  Whether the marketing and labeling of the Target Debit Card is deceptive;

    b.  Whether Defendant misrepresented to Plaintiffs and the Class how Target Debit Card transactions were processed;

    c.  Whether Plaintiffs and members of the Class and Subclass were harmed by Defendant's misrepresentations;

    d.  Whether Defendant's conduct breached its contract with consumers; and

    e.  Whether Plaintiffs and the Class have been damaged, and if so, the proper measure of damages.

103. **Typicality**:  Like Plaintiffs, many other consumers used the Target Debit Card and believed it functioned like a typical debit card.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and each Class member were injured by Defendant's false representations about the Target Debit Card.  Plaintiffs and the Class have suffered the same or similar injury as a result of Defendant's false, deceptive and

31

misleading representations. Plaintiffs' claims and the claims of members of the Class emanate from the same legal theory, Plaintiffs' claims are typical of the claims of the Class, and, therefore, class treatment is appropriate.

104.   **Adequacy of Representation**:   Plaintiffs are committed to pursuing this action and has retained counsel competent and experienced in prosecuting and resolving consumer class actions.   Plaintiffs will fairly and adequately represent the interests of the Class and do not have any interests adverse to those of the Class.

105.   **The Proposed Class and Subclass Satisfy the Rule 23(b)(2) Prerequisites for Injunctive Relief**. Defendant has acted or refused to act on grounds generally applicable to the Classes thereby making appropriate final injunctive and equitable relief with respect to the Classes as a whole. Plaintiffs remain interested in using their Target Debit Cards; there is no way for them to know when or if Defendant will cease deceptively charging RPFs.

106.   Specifically, Defendant should be ordered to cease from further charging RPFs and to stop referring to the Target Debit Card as a "debit card."

107.   Defendant's ongoing and systematic practices make declaratory relief with respect to the Class appropriate.

108.   **The Proposed Class Satisfies the Rule 23(b)(3) Prerequisites for Damages**. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.   The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class member.

<u>**CAUSES OF ACTION**</u>

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Violations of MPCFA, Minn. Stat. § 325D.44,** *et seq***.)**
**Asserted on Behalf of the National Class**

109.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

110.   Defendant engaged in deceptive trade practices in the course of business, in violation of the MPCFA, in the following ways:

Defendant violated Minn. Stat. § 325D.44(5) by misrepresenting the Target Debit Card as a "debit card" and failing to disclose that the Target Debit Card does not function like a normal debit card;

33

Defendant violated Minn. Stat. § 325D.44(7) by representing that the Target Debit Card is the standard of a true "debit" card, when it does not function like a normal debit card;

Defendant violated Minn. Stat. § 325D.44(13) by engaging in conduct which created a misunderstanding regarding the use of the Target Debit Card and failing to disclose that use of the card can result in up to four fees in the event of an insufficient transaction as detailed herein.

111.   Minnesota Statute § 325D.13 provides that "no person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."  Consumer protection laws of other states make similar conduct unlawful.

112.   By engaging in the conduct described herein, Defendant violated and continues to violate Minn. Stat. § 325D.13 and the similar laws of other states.

113.   Defendant's "debit" card created consumer confusion, it failed to correct reasonable understandings of the name, and misrepresented the actual functioning of the card.  These failures, including failing to disclose that consumers can be charged up to four fees in the event of an insufficient funds transaction are material, and had Plaintiffs and the other Class members known about it, they would have either not signed up for or

used the cards.  Defendant's misrepresentations and omissions were made to the public at large, affecting thousands of Class members and created economic injury. As such, this is an appropriate action under the MPCFA.

114.   Where, as here, Plaintiffs' claims inure to the public benefit as Defendant has failed to disclose its deceptive conduct to the public at large, Minnesota's private-attorney general statute, Minn. Stat. §8.31, subd. 3a, allows individuals who have been injured through a violation of these consumer-protection statutes to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

115.   Defendant's deceptive scheme emanated in Minnesota, was carried out in Minnesota and affected Plaintiff and the Class members.

116.   Defendant failed to advise the public about what it knew about the functionality of the Target Debit Card.

117.   As a direct and proximate result of Defendant's deceptive conduct in violation of Minn. Stat. § 325D.44, *et seq*., Plaintiffs and the Class members have been damaged.

## SECOND CLAIM FOR RELIEF
### (Violations of MPCFA, Minn. Stat. § 325F.68, *et seq*.)
### Asserted on Behalf of the National Class

118.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

119.   Plaintiffs, the Class members, and Defendant are all "persons" within the meaning of the MPCFA, Minn. Stat. § 325F.68.

120.   The Target Debit Card is "merchandise" within the meaning of the MPCFA, Minn. Stat. § 325F.68.

121.   Defendant engaged in deceptive practices related to the sale of the card, including (1) by the nature of the Target Debit Card by the product's very name, by issuing marketing materials and card agreements that fail to correct reasonable understandings of the name, and that on their own misrepresent the actual functioning of the card.; (2) omitting and concealing material facts about the Target Debit Card, that: (a) use of the card can commonly result in two, three, or four fees in the event of an insufficient funds transaction, or approximately *$150 in fees*; and (b) the card operates on the Automated Clearinghouse Network ("ACH Network"), not the debit card networks used by virtually every other debit card.

122.   Defendant's deceptive scheme emanated from Minnesota, was carried out in

36

Minnesota and affected Plaintiff and the Class members.

123.   Defendant intended that Plaintiffs and Class members rely on the acts of concealment, omissions, and misrepresentations regarding the nature of the Target Debit Card, so that Plaintiff and the Class members would sign up for the cards.

124.   Plaintiffs and the Class members did, in fact, rely on the acts of concealment and omissions regarding the nature of the Target Debit Card.

125.   Had Plaintiffs and the Class members known about the true nature of the Target Debit Card, they would not have made the transactions using the Target Debit Cards or signed up for the card.

126.   Where, as here, Plaintiffs' claims inure to the public benefit, Minnesota's private-attorney general statute, Minn. Stat. § 8.31, subd. 3a, allows individuals who have been injured through a violation of the MPCFA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

127.   Therefore, Defendant used unfair methods of competition and unfair or deceptive acts or practices in conducting its business.

128.   Through these deceptive statements and misleading omissions, Defendant violated Minn. Stat. § 325F.69 and proximately caused damage to Plaintiffs and the Class members.

37

## THIRD CLAIM FOR RELIEF

### (Violations of Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67) Asserted on Behalf of the National Class

129.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

130.   Minnesota's False Statement in Advertising Act ("FSAA"), Minn. Stat. § 325F.67, provides a cause of action to "any person, firm, corporation, or association" who purchases goods or services through advertising which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading." Consumer protection laws of other states make similar conduct unlawful.

131.   Where, as here, Plaintiffs' claims inure to the public benefit, Minnesota's private-attorney general statute, Minn. Stat. § 8.31, subd. 3a, allows individuals who have been injured through a violation of the FSAA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorneys' fees.

132.   By engaging in the conduct herein, Defendant violated and continues to violate Minn. Stat. § 325F.67 and the similar laws of other states.

133.   Defendant's misrepresentations, knowing omissions, and use of other sharp business practices include, by way of example:

Defendant's fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and nature of the Target Debit Card;

Defendant's fraud and misrepresentations by omission, of information about the use of the Target Debit Cards, and Defendant's knowledge of those misrepresentations; and

Defendant's concealment of the true nature of its Target Debit Card.

134.   Defendant and its agents and distributors also made untrue, deceptive, and misleading assertions and representations about the Target Debit Cards by making and repeating the various statements about the alleged nature and use of the Target Debit Cards as referenced herein.

135.   As a result of Defendant's conduct, Plaintiff and the Class members have suffered actual damages in that they utilized the Target Debit Card for a transaction that they would not otherwise have made.  There is an association between Defendant's acts and omissions as alleged herein and the damages suffered by Plaintiffs and the Class members.

136.   As a result of Defendant's untrue, deceptive, and misleading assertions and representations about the Target Debit Card, Plaintiffs and the Class members have and will continue to suffer damages that include RPFs and NSF Fees.

137.   As a direct and proximate result of Defendant's unlawful acts described above, Plaintiffs and the Class members have been injured and seek damages, as well as the declaratory and injunctive relief set forth below in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the National Class)

138.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

139.   Plaintiffs and Target have contracted for debit card services, as embodied in the Target Debit Card Agreement and related documentation.

140.   Defendant breached its express contracts with Plaintiffs and members of the Class by not processing transactions made with the Target Debit Card like typical debit cards and charging RPFs as a result, along with the other contract breaches described herein.

141.   Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the Agreement.

142.   Target's contract never expressly states the processing network it will use for Target Debit Card transactions. However, reasonably read, the contract indicates

that Target will use the same processing network as all other debit cards and will choose a processing method that will not cause insufficient funds or NSF Fees.

143.   When it failed to do either, and in fact chose to process transactions on the ACH Network, it breached the contract.

144.   Moreover, it was an express breach of contract to decide to process transactions in a way that could lead to NSF Fees, since the contract only disclosed the possibility of overdraft fees.

145.   Target promised that "When you use your Card, **you will be limited by the amount of funds in your Deposit Account…**as of the date the Depository Bank receives and processes an EFT."   Because, in a normal debit card transaction, a bank "receives" notification of the transaction immediately, and because normal debit card transactions are rejected (or limited) by the amount of funds in the account at that time, this provision was an express promise that Target Debit Card would be processed on the same network and in the same manner as a normal debit card—including immediate authorization or rejection based on available funds in a linked checking account.

146.   Limitation "by the amount of funds in your Deposit Account" is only possible on the normal debit card network, not on the ACH network.   This must be understood to be a promise to use the same processing networks true debit cards use.

41

147.   Plaintiffs and the Classes were damaged by Target's breach of contract.

**FIFTH CLAIM FOR RELIEF**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**(On Behalf of Plaintiff Dixon and Florida Subclass)**

148.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

149.   This claim is pled in the alternative, should the Court decline to apply the Minnesota Deceptive Trade Practices Law to the National Class.

150.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA") prohibits "[u]nfair methods of competition, or unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." §501.204(1), Fla. Stat.

151.   Plaintiff, Michelle Dixon, is a "person" within the meaning of §501.203(6), Fla. Stat., and as envisioned in §501.211, Fla. Stat.

152.   Defendant is engaged in "[t]rade or commerce" within the meaning of §501.203(8), Fla. Stat.

153.   By engaging in the conduct described herein, Defendant violated and continues to violate §501.204(1), Fla. Stat.

154.   FDUTPA allows individuals, such as Plaintiff Dixon, to bring an action to enjoin Defendant's deceptive conduct as well as to recover actual damages and attorney's fees. §501.211(1)–(2), Fla. Stat.

155.   Defendant's   wrongful   conduct   is   likely   to   create   confusion   or misunderstanding including, by way of example and not by limitation: Defendant's labeling and marketing of the Target Debit Card as a "debit card" and its failure to disclose that the Target Debit Card does not function like a normal debit card.

156.   As a result of the Defendant's conduct, Plaintiff, Dixon, and the Florida subclass members have suffered actual damages in that they paid RPFs to Target and NSF Fees to their banks.

157.   In order to prevent future injury to Plaintiff and the Florida Subclass, Plaintiff and the Florida subclass seek injunctive relief in the form of a disclosure that the Target Debit Card does not function like a normal debit card.

158.   As a direct, proximate and foreseeable result of Defendant's violation of the statute, Plaintiff, Dixon and the Florida subclass members were injured and suffered damages, and are entitled to recover their actual damages, costs and disbursements, including costs of investigation and reasonable attorneys' fees, as well as injunctive relief

and other equitable relief, including restitution, as determined by the Court, pursuant to Florida law, including §501.211(1)–(2), Fla. Stat.

## SIXTH CLAIM FOR RELIEF
### North Carolina Consumer Protection Law
**(On Behalf of Plaintiff Powell and the North Carolina Subclass)**

159.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

160.   This claim is pled in the alternative, should the Court decline to apply the Minnesota Deceptive Trade Practices Law to the National Class.

161.   As described herein, Target's unconscionable and unfair actions regarding the marketing and naming of the TDC, as well as the assessment of RPFs and the processing of TDC transactions, constitute unfair competition and unfair and deceptive trade practices as defined by the laws of the United States of America and the State of North Carolina, including but not limited to N.C.G.S. § 75.1-1 et seq.

162.   As described herein, the assessments are both unfair and deceptive, as they violate industry standards and offend public policy, and they deceive customers who do not expect the charges.

163.   Target's actions affected commerce in North Carolina, as many of its North Carolina customers were charged these unfair and deceptive fees.

44

164.   Plaintiff Powell relied upon Target's representations and omissions. This reliance was reasonable, as it was based upon Target's marketing and reasonable consumer understanding of the meaning of the term "debit card."

165.   Plaintiff has been actually damaged as the direct and proximate result of Target's unfair competition and unfair and deceptive trade practices by overcharges on their account.

166.   Plaintiff is entitled to recovery of treble damages and, in the discretion of the Court, reasonable attorneys' fees and costs by virtue of Target's unfair and deceptive trade practices.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes, seek judgment in an amount to be determined at trial, as follows:

(a)      For an order enjoining Defendant from continuing the unlawful practices set forth above;

(b)      For declaratory and injunctive relief as set forth above;

(c)      For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d)      For compensatory damages according to proof;

(e)      For reasonable attorneys' fees and costs of suit;

(f)      For pre-judgment interest; and

(g)      Awarding such other and further relief as this Court deems just, proper

and equitable.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all claims so triable.


Dated:  September 12, 2018                    Respectfully submitted,

                                              **PEARSON, SIMON & WARSHAW, LLP**


                                              By: */s/ Melissa S. Weiner*
                                                   Melissa S. Weiner (MN No. 0387900
                                                   mweiner@pswlaw.com
                                                   800 LaSalle Avenue, Suite 2150
                                                   Minneapolis, MN 55402
                                                   Telephone: (612) 389-0600
                                                   Facsimile: (612) 389-0610

Jeffrey D. Kaliel (*pro hac vice to be filed*)
Sophia G. Gold (*pro hac vice to be filed*)
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
*jkaliel@kalielpll.com*
*sgold@kalielpllc.com*

Jeff Ostrow (*pro hac vice to be filed*)
Joshua Levine (*pro hac vice to be filed*)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
Facsimile: 954-525-4300
*ostrow@kolawyers.com*
*levine@kolawyers.com*

Hassan A. Zavareei (*pro hac vice to be filed*)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*hzavareei@tzlegal.com*

**ATTORNEYS FOR PLAINTIFFS**